# Russell Fork Coal Co. et al. v. Hawkins et ux.

May 31, 1949.

As Modified on Denial of Rehearing

November 15, 1949.

Howard & Combs and Hobson & Scott for appellant.

F. M. Burke and J. A. Runyon for appellees.

JUDGE KNIGHT—Reversing.

## Statement of the Case

This is a suit for damages in the sum of $25,969.50 filed by appellees Herbie Hawkins and B. B. Hawkins, his wife, against appellant Russell Fork Coal Co. and Peter Mitchell, Inc. The latter named company was let out on peremptory instructions at the conclusion of the evidence and there is no cross appeal as to it. The negligence complained of in the petition and amended petitions is that as the result of a strip mining operation conducted by appellant at the headwaters of Ferrells Creek on Weddington Fork a large excavation covering three to four acres and six or seven feet deep was created by removal of the overburden and mining of the coal seam thereunder; that this excavation was allowed to fill with water making a lake or pond four or five feet deep; that on the night of August 1 and the early morning of August 2, 1945, as the result of a heavy rain, this

water broke through the wall of dirt and rocks and ran into Weddington Fork of Ferrells Creek carrying with it logs, tree laps, stumps, dirt and debris which had been cast over the mountain at the head of Weddington by appellant, its agents, servants and employees, and resulted in a flood tide down Ferrells Creek which destroyed the dwelling house, a tenant house, store house and stock of goods and fixtures therein. They further alleged that appellant was negligent in removing the overburden and throwing it over the hillside thereby creating obstructions in Weddington Fork, a tributary of Ferrells Creek, which helped cause the damage complained of.

Answer filed by appellant admitted it was engaged in the strip mining operation referred to in the petition, denied it was guilty of any negligence in its operation and pleaded that damage, if any, caused to appellee was the result of an unusual storm and rain of cloudburst proportions and not by any negligence of appellant.

A reply made up the issues and on the trial the jury brought in a verdict in favor of appellees in the sum of $10,000. Appellant prosecutes this appeal from the judgment based on that verdict.

Reversal is sought on three grounds: (1) That appellant was entitled to a directed verdict; (2) instructions were erroneous; (3) the court erred in refusing to allow the introduction of competent testimony offered by appellant.

### The Setting of the Case

Appellees owned and lived in property at the mouth of Ferrells Creek where it empties into Russell Fork of Big Sandy River. Ferrells Creek is formed by the converging of two forks, Road Fork and Weddington Fork, and flows in an almost westerly direction to its confluence with Russell Fork. Many smaller streams or forks flow into it from the north and south, the largest being Middle Fork, Honey Fork and Abner Fork from the north, and Blue Pond, Slip Rock, Spruce Pine and Brushy Fork from the south. It runs through a narrow valley with precipitous mountains on each side. From its mouth to its source at the confluence of the two forks referred to there is a rise of about 360 feet (2.73%)

thus providing a natural setting for the flash floods that occasionally hit the mountain section. There is a state highway up Russell Fork on the Ferrells Creek side and this highway crosses over Ferrells Creek near its mouth on a fill about 18 feet high, and the creek is carried under the fill by a culvert which has three 10 x 10 flues through which all the water from the creek must go to reach Russell Fork. With its various tributaries Ferrells drains a watershed area of 4051 acres. About 346 acres of this watershed are on Weddington Fork, and appellant's strip mining activity is confined to about 90 acres on top of the mountain at the head of Weddington Fork. The actual operation involved in this suit covers less than 10 acres and is about 3½ miles from the mouth of the creek at the point where the property of appellees is located.

Strip mining is not a common practice in the mountain section of this state but in this instance the seam of coal owned or leased by appellant, known as the Upper Elkhorn seam, lies high on the mountain and the stripping process was adopted by appellant as the most feasible method of recovering the coal. The overburden of earth, rocks, roots and stumps of timber which had been cut off was removed by blasting, bulldozers and steam shovels and cast over the side of the mountain onto land owned by or under lease to appellant. The overburden was not stripped off the entire top of the mountain but in the particular operation here involved there was a stripping of the overburden about 60 feet wide around the southern or right hand side of the mountain from a point known as Weddington Gap on the westerly side of the mountain to a point on the eastern side of the mountain. The overburden from this strip was cast over on the Beaver Creek or southern side of the mountain and this strip is not directly involved in this case. Another strip of approximately the same width and length went around the northern or left side of the mountain and the overburden from this strip was cast over the Weddington Fork or northern side of the mountain, and it is this part of the overcasting that is here complained of. The two strips converged at a point near the eastern side of the mountain and from this point of convergence the two strips widened out and from here to the eastern side of the mountain the stripping was complete, that is the entire top of

the mountain was removed, thus stripping all overburden on this eastern knob down to the coal seam. It is on this completely stripped knob on the eastern side of the mountain that the so-called lake or pond or basin was formed when the coal was lifted or excavated after the stripping was completed and it is from water which allegedly came from this lake or pond on the night of the flood that appellees attribute their loss and the destruction which hit the valley on the night in question. To complete the picture of the stripping operation, it needs to be said that the 60 foot stripping around the mountain and the stripping on the knob on the eastern side did not run out to the outcrop since this outcrop coal was of poor quality and not worth recovering. This left a berm on the outer side of the strip, and on the inner side of the strip was the 40 foot wall which constituted the unstripped top of the mountain and is referred to in this record as "the island."

## Proof in the Case

We summarize as briefly as possible the voluminous testimony. The evidence of appellees was to the effect that this great mass of overburden had been thrown over the mountain at the headwaters of Ferrells Creek and that this mass contained tons of rock of all sizes, trees, stumps, logs, shale and dirt. Workmen who were on the job the day of August 1 or the night of August 1 and 2 testified that water had accumulated in the pit to a depth estimated at from 2 to 4 feet. Several persons who had lived on the creek, some for many years, testified that they had seen harder rains before than had fallen on this occasion, and some stated that the area had experienced harder rains since. Many stated that they had seen more water in the creek on previous occasions but had never seen as much debris and that the water and debris combined made the creek higher than ever before. These witnesses testified that there were two rises of the creek on this occasion and that the creek had fallen 1½ to 2 feet before the big washout and that the first rise contained nothing but water. The second rise of the creek came about 6 o'clock. Estimates of its height varied from 10 to 25 feet with most of the witnesses placing it at 15 feet. The witnesses estimated that it took from 5 to 20 minutes for the rise to pass, practically all of them placing it at 5 or from 5 to 10,

and stated that the creek was soon down to normal. Some of the witnesses who observed conditions at the mouth of Weddington stated that that fork came out larger than did the left fork although under normal conditions the latter was larger. Evidence was given that very little debris came out of the left fork. Rocks were said to have been observed far down the creek with shot holes in them where they had been drilled to insert dynamite. The witnesses detailed the havoc wrought by the second rise on Weddington Fork and on Ferrells Creek below Weddington and, while on cross examination they admitted that some damage had been done on other tributaries, they insisted that it was not nearly as severe as that on Weddington. Those witnesses who described the accumulation of water in the pit just prior to the flood stated that when they returned to work a few days after the flood, the berm had been broken through, the water was gone and part of the overburden had gone from the hillside into the branch in the valley. Several men who had worked at the stripping operation testified that the "weep hole" in the berm, which appellant's proof shows to have been opened for drainage of the lake, had been filled back and the road reestablished on top of the berm. No witness for appellees fixed exactly the date that the weep hole was opened or the date it was closed but none denies it was opened some time prior to the flood.

Evidence for the appellant was that the mining operation carried on at the head of Weddington was carried on in the same manner as was customary at all strip mines on like terrain. Several persons working at the mine testified that the weep hole was opened on July 25 and was not closed prior to the flood. These workmen testified that they drove over the road in the pit on the night before the flood, some coming off the mountain as late as 4 a.m. on the day of the flood, and that there was no water in the pit other than ordinary rain water as would be found on any road. Some of the workmen described in detail the opening of the weep hole and stated that all the water ran out going down the valley and washing off a coal shed. Many persons living on Ferrells Creek, its tributaries, other creeks and their tributaries, testified that it rained almost all the night preceding the flood and that shortly after daybreak and just before the flood there was a very hard

rain. The witnesses testified that this was the hardest rain they had ever seen. Conditions on the tributaries of Ferrels Creek, other than Weddington, and conditions on the other streams were described.

It was stated that the water coming out of Blue Pond branch tore up the branch, tore out some sled roads and paths and tore out some fence and moved logs and other things out of the hollow. Another witness testified that Blue Pond flooded lots of stuff but that no houses washed off.

According to the testimony of one witness, Middle Field Hollow was coming out large but the witness could make no comparison of the size of the water with that on other occasions. One gate thereon was completely covered with rock. No houses washed off, no trees or laps came out of the creek. Rock had washed out of Middle Field before but never as badly as on this occasion. Another witness testified that the water was coming out and rocks coming down when he was awakened about 1 a. m. and that after the hard rain near daybreak, water was knee deep on level ground where it had run off the hills.

A witness who returned to her home on Slick Rock about three days after the flood stated that Slick Rock had torn up more than ever before. Another witness stated that Slick Rock ran the biggest he had ever seen it; that he observed a few chunks and brush and limbs and that rocks were piled up at the mouth. He testified that up the hollow the road was torn some and that there were three or four little slides.

Honey Fork was stated to have been higher than it had ever been before. It rose and then fell and one witness who decided to leave his chicken coop found that the second rise had taken the coop. Honey Fork washed out some fence and rock walls; no houses were washed off the Fork and the witness did not see any logs but observed brush and stumps coming out of the Fork.

A witness living between Weddington and Road Forks testified that Road Forks was biggest he had ever seen it; that he lost some fence on Road as well as on Weddington. He stated that he lost a coal house on

Weddington during the first rise and a wash house and toilet on the second rise. On cross examination this witness admitted that Road Fork did not wash like Weddington Fork did.

There was evidence that Brushy Fork split, the bigger part coming through the property near the mouth leaving rocks in the yard and garden and that the water flowed into Ferrells some distance down stream from its usual mouth. Witness living at the head of the right fork of Abner Fork testified that the water got up 3 feet on a rock wall but that she could not compare that with previous occasions. Another witness testified that it rained as hard as it had in 1935, that the creek got in his yard on both occasions but that it might have been an inch fuller this time. He stated that there were 25 to 35 houses on Abner and that none washed out but that a coal house or two was lost. The witness saw no stumps but saw one tree in the creek. Another witness stated that it was a big creek and that he had never seen as much damage up the forks on any other occasion. He stated that the hollows came out and brought logs to the mouth and piled them up; that the road was torn up pretty badly, that lots of fence was washed off, that a bridge or two was taken out, and that a barn partly washed away.

The creek that sustained the severest damage, other than Ferrells, was Beaver Creek which drained a watershed just south of Ferrells. Several witnesses stated that the rain which fell on Beaver was the hardest they had ever seen. The evidence was to the effect that Beaver rose, fell about 2 feet, and then after the severe rain came out high. The second rise brought houses and everything. Another witness stated that Beaver went wild; that the creek came out following the hard rain and washed away fences, completely took the road and cut into the highway at the mouth of the creek. Another witness described the large body of water at the mouth of Beaver and stated that one or two houses were floating in it, and that for the first three-fourths mile up the creek, 75% of the road was destroyed. He described a tremendous gorge of lumber behind an iron bridge on the creek. It was developed on cross examination that prior to the flood a railroad had been constructed up the creek thereby narrowing its channel and that strip

mining was being carried on at the head of the creek and some of its tributaries.

A witness who lived on Card Creek, a watershed east of Ferrells, testified that the creek was higher than he ever remembered it being before. The county agricultural agent who made a survey of the damage of the flood testified that the highway at the mouth of Card Creek was almost cut in two. Another witness testified that two small houses and a bridge washed down Card Creek and lodged at the culvert. A witness who lived on Lick Creek which is north of Ferrells testified that it was a very hard rain; that some little bridges washed off; that the porch on his son-in-law's house was torn off; that laps and bushes were running in the creek and that the road was badly torn up. Another testified that some bridges came down, one of which got against his bridge and that the bridge was carried off. He stated that the bank was cut into and that logs tore fences loose and that a store building on the creek was torn apart. The witness stated that it was the largest water he had ever seen.

Kettle Camp Creek, south of Ferrells, according to the testimony of one witness, had a big run out with a lot of filth, trash and rocks and washed out some rock walls along the bank and damaged the road. On cross examination this witness stated that they had had a bigger creek since the flood and admitted that there are four or five truck mines on the creek and that much debris had been thrown in the stream. Another witness testified to substantially the same and told of a large log which blocked the culvert but on cross examination stated that the log had been put into the creek by the miners.

Evidence was also introduced comparing conditions on Grapevine Creek lying north of Ferrells. One witness stated that the creek damaged 1½ acres of corn, and that while his bridge did not go out, the one above it did. The witness stated he found the bridge, some lumber and logs in his cornfield. Another stated that the creek rose about 6 feet and that it did much damage.

A map opposite page 2 of appellant's brief shows the location of these streams, some of which are considerable distance from Ferrells Creek. The judge an-

nounced that he was permitting the introduction of the evidence of conditions on these distant streams only to aid the jury in its determination of conditions on Ferrells Creek.

The other evidence introduced was the result of computations of the volume of water and the quantity of water at Ferrells Creek and some of its tributaries which appellant maintains demonstrates conclusively that it was a physical impossibility for the mining operation to have caused the flood. According to this testimony, if the pit contained $3\frac{1}{2}$ feet of water, its maximum height due to the berm, its velocity would have been but 110 cubic feet per second while the velocity at the mouth of Ferrells Creek was computed to be 6000 cubic feet per second, and would have been of but negligible effect. The hydraulic engineer computed the backwater at the mouth of Ferrells Creek to have been 1,700,000 cubic feet. While taking Rimmer's estimate of 500,000 gallons in the pit at the most, the comparable figure would have been 60,000 cubic feet in the pit or about thirty times as much in the backwater as in the pit.

## Conclusions

We think it established by the evidence that a heavy storm and an unusually heavy rain passed over the southeastern section of Pike County on the night of August 1 and the early morning hours of August 2, 1945, resulting in this flash flood. It was the same rain that caused the damage referred to in the case of Fife v. Chesapeake & O. R. Co., 307 Ky. 541, 211 S. W. 2d 854, 855, in which this rain is referred to as being one "of cloudburst proportions." The creek which overflowed and caused the damage in that case empties into Russell Fork opposite Beaver Creek within about two miles of appellees' home. It is shown in this record that Beaver Creek, Lick Creek, Card Creek and Grapevine Creek, all draining watersheds adjacent to the watershed drained by Ferrells Creek, had unusually hard rains on the night and morning herein referred to which resulted in great damage. It is true that many of appellees' witnesses who are residents of the Ferrell Creek valley testified that the rain in question was an ordinary rainfall and that they had seen it rain that hard before. The effect of their testimony was weakened when it

was shown on cross examination that they, or their friends, neighbors or kinfolks, had suits similar to this one pending against appellant company arising out of this flood. Likewise for the same reason of interest the testimony of some employees of the appellant company, who testified of the unusual and unprecedented rain which fell in the valley on that night, can be discounted. But from the disinterested testimony and from the physical facts and the results on this and surrounding watersheds, we think there can be no doubt but that the rain on the early morning of August 2 reached cloudburst proportions which caused great damage over the sections touched by it, including the Ferrells Creek watershed.

Under these conditions it is difficult to believe that the small body of water on top of the mountain 3½ miles away, even if it was filled to capacity and broke loose suddenly, could have been the cause of the damage to appellees' home.

After careful consideration of the entire record of eight volumes and over eleven hundred pages, we are forced to the conclusion that the loss sustained by appellees, great as it is, was brought about by the forces of nature over which man has no control and that it is not shown by the evidence that their loss was caused by negligence of appellant. At the conclusion of all the evidence, the lower court should have sustained appellant's motion for a directed verdict. It is not necessary to consider other grounds for reversal raised by appellant.

Wherefore the judgment is reversed for further proceedings consistent with this opinion.